MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-6840
      FAX: (415) 436-7234
      Email: kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 14-0285 JST |
| Plaintiff, | **UNITED STATES' MOTION FOR DETENTION** |
| v. | Date: June 26, 2014 |
| JEREMY DONAGAL, | Time: 9:30 a.m. |
| Defendant. | Hon. Kandis A. Westmore |

      Defendant Jeremy Donagal has been charged with numerous counts of conspiracy to manufacture, distribute, and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 846, with the manufacture, distribution, and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), with the sale of counterfeit drugs, in violation of 21 U.S.C. § 331(i)(3), and with international money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 1956(a)(2)(B)(ii).  Because Defendant poses a risk of flight and a danger to the community, and because no condition or combination of conditions will reasonably assure his appearance in court or assure the safety of the community, the government respectfully submits this memorandum in support of its motion that Defendant be detained pending trial.

**ARGUMENT**

**I.**    **There is a Presumption in Favor of Detention in the Bail Reform Act In This Caseke This**

Under the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, there is a presumption that a defendant should be detained pending trial in cases where there is probable cause to believe that the defendant committed a drug trafficking offense that features a maximum term of imprisonment of ten years or more.  The basis of this presumption is that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.  18 U.S.C. § 3141(e)(A).  *See United States v. Salerno*, 481 U.S. 739, 750 (1987) ("The act operates only on individuals who have been arrested for a specific category of extremely serious offenses . . . . Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest.") (citation omitted);  S.Rep. No. 98-225, p. 6-7 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3189; *United States v. Koon*, 6 F.3d 561, 566 (9th Cir. 1993) (justifying the presumption of dangerousness in 18 U.S.C. § 3142(f)(1) because "there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons").

Where the presumption applies, the burden of production shifts to the defendant, although the burden of persuasion continues to rest with the government.  *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).  Even if the defendant proffers evidence to rebut the presumption in favor of detention, "the presumption remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."  *Id.* (citation omitted).  As paraphrased, the factors in Section 3142(g) are: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against the defendant (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug and alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *Id.*; 18 U.S.C. § 3142(g).  A finding by the Court that the defendant is a risk of flight must be supported by a preponderance of the evidence, while a finding that the defendant poses a danger to the community must be supported by clear and convincing evidence.

*United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3141(f)(2)(B).  In this case, both the conspiracy charge, 21 U.S.C. § 846, and the manufacture, distribution, and possession with intent to distribute charges, 21 U.S.C. § 841(a)(1), carry a maximum prison term of twenty years, and thus, there is a presumption that Defendant should be detained.  Even without this presumption, the facts of this case indicate that no conditions of release can be fashioned to address the risk of Defendant's nonappearance or the danger he poses to the community.

**II.**     **Defendant Should Be Detained Pending Trial**

    **A.**     **The Nature and Circumstances of the Charged Conduct Demonstrate a Danger to the Community and a Risk Of Flight**

        1)     <u>Overview of Defendant's Drug Trafficking Organization</u>

Defendant was the leader of an industrial drug manufacturing operation.  Under Defendant's direction, his organization produced over a million Xanax tablets per week and shipped these pills throughout the country.  Defendant was also responsible for the production and distribution of significant quantities of GHB, steroids, and other drugs.

When agents executed search warrants on locations controlled by Defendant, they seized a massive amount of drugs and related contraband.  When combined with earlier controlled purchases and limited seizures during the investigation, agents recovered the following:  six industrial pill presses, including multiple "rotary" presses capable of stamping out tens of thousands of pills per hour; two industrial mixers; roughly 1.3 million Xanax tablets; over 300 pounds of anabolic steroids; four pounds of suspected oxycodone pills; over four gallons of GHB; roughly 13 kilograms of alprazolam powder (estimated to produce approximately 3.9 million Xanax tablets); an estimated 4,500 kilograms of binding agent, which, when combined with sufficient alprazolam, would generate over 28 million Xanax tablets; and other materials.

In addition to the nine defendants in this case, evidence gathered from Defendant's enterprise led to the arrest of nearly 60 other people throughout the country and the seizure of multiple tens of thousands more pills, as well as cash and firearms.

Defendant's operation was as sophisticated as it was massive.  For raw materials, Defendant arranged for large quantities of alprazolam (Xanax) powder and pill-making equipment to be shipped

from China, usually to his co-defendants or other nominee addresses.  To pay for this material, he wired significant sums of cash to his connections in China, often through Western Union.  For example, agents obtained records showing Defendant, through co-defendants Christopher Neely and Alicia Mitts, wiring over $80,000 to recipients in China over a period of three months.  In fact, Defendant told one of his associates that his earlier wires to China generated such a high volume of suspicious transaction activity that Western Union "blacklisted" him from conducting any further business with the company.  In light of this experience, Defendant arranged to have others place the wires to China on his behalf and to structure those wires to avoid detection by law enforcement.

Defendant sold his pills online, including using the underground websites Silk Road, Silk Road 2.0, and his personal website, www.xkloves.us, and he shipped drugs to 48 states.  Prices for his Xanax tablets varied depending on the size of the order, ranging from $2 per pill for small orders to $0.60 per pill for orders in the multiple tens of thousands.  Defendant was frequently paid by his customers in the digital currency of Bitcoins.  He was also paid in cash, regularly receiving boxes full of cash from his Internet sales.  For example, in selected interceptions of just one location to which Defendant had payments sent, the address of co-defendant Thomas Elliot (using the fictitious name "Tim Elliot"), agents seized over $175,000 in cash that was sent through the U.S. mail.  During the execution of search warrants on May 28, 2014, agents found at least one other cash package at a location associated with Defendant.  To date, agents have seized over $200,000 in cash and $25,000 in Bitcoins from Defendant's operation.

It is critical to note, however, that this figure represents a small fraction of the proceeds that were flowing to Defendant.  The cash seized came only from funds that Defendant had on hand on May 28, 2014, and from an earlier limited seizure of packages.  As discussed above, Defendant's operation was high-volume and lucrative, and agents do not know where Defendant has hidden the rest of the money.

Defendant also sold drugs locally, distributing Xanax tablets, GHB, and steroids.

Defendant employed a number of individuals in various capacities, including the co-defendants in this case.  Some individuals worked for him manufacturing pills and sending out completed orders. Others were responsible for maintaining the machines.  Still others, including people he had never met in person, were responsible for collating and consolidating his Silk Road orders, for maintaining his Silk

Road website, and for coordinating the conversion of some of Defendant's Bitcoins into cash – cash that was then shipped to Defendant.  Defendant hired other individuals to receive packages on his behalf, both packages of cash from customers and from Bitcoin conversation and packages of alprazolam powder from China.

As an example of how organized Defendant's operation was, Defendant installed a time clock at his manufacturing location, and those employees who worked on the pill presses and industrial mixers punched in and out, as in a regular factory.

2)     <u>Defendant's Offense Poses a Danger to the Community</u>

Defendant has been charged with a number of drug trafficking crimes.  Further, Defendant has a prior felony drug conviction, and he was on probation for another drug offense at the time he organized and executed the scheme described above.  The likelihood that Defendant will continue to sell drugs should he be released presents a significant danger to the community.  *See United States v. Ruben*, 974 F.2d 580, 586 (5th Cir. 1992); *United States v. Fulgham*, Case No. CR 12–0124 CW (KAW), 2012 WL 2792439, at *4 (N.D. Cal. July 9, 2012) ("The Senate Report states: 'The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the 'safety of any other person or the community.' Defendant's tendency to repeatedly commit similar crimes shows that he poses an unmitigable danger to the community.") (quoting S. REP. No. 225, 98th Cong., 1 st Sess. 23, note 7 at 13).

Defendant also poses a significant danger to the community by virtue of the fact that he is a convicted felon who was in possession of an assault-style weapon with an obliterated serial number. Among the locations agents searched on May 28, 2014, was a storage unit that Defendant rented. During the course of the investigation, agents observed Defendant going into and out of this location numerous times.  Inside the unit, agents found a significant quantity of steroids, as well as equipment that could be used in processing steroids.  They also found an AR-15 style carbine rifle, complete with several loaded magazines of ammunition.  *See* Ex. A (photograph of the weapon).  Even more significantly, the serial number for this weapon had been obliterated.

3)      The Penalties Associated with the Charged Crimes Create a Risk of Flight

An assessment of the nature and circumstance of the charged offenses includes consideration of the penalties. *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). Under 21 U.S.C. §§ 846, 841(a)(1), and 844(b)(1)(C), Defendant faces a maximum sentence of twenty years in prison for each offense. With the discovery of the firearm with the obliterated serial number, Defendant faces additional penalties as well. These sentences provide considerable incentive for Defendant to flee, particularly when considering that Defendant has avoided lengthy incarceration to this point. *Townsend*, 897 F.2d at 995 ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.").

**B.      There is Considerable Evidence Against Defendant**

Although not the most significant factor, the Court should consider that there is a wealth of evidence against Defendant. Agents have a host of recorded conversations with Defendant in which he discussed and set up drug transactions. Agents also coordinated a number of controlled purchases of drugs with Defendant, including deals for Xanax tablets, GHB, and steroids. This ultimately led to the authorization of a Title III interception of Defendant's phone. During the period of interception and during earlier recorded calls, texts, and in-person communications, Defendant openly discussed his drug operation. He talked about the massive volume of orders he had to fill, the difficulty in getting quality help, and various strategies to launder money, including setting up a purportedly legitimate business to provide a front for the drug operation.

Agents also recorded Defendant reveling in his success. For instance, at one point during the interception period, he boasted of having his best week ever – a week in which he produced over a million Xanax tablets. In an earlier conversation, he told a confidential informant that he had $1.17 million in cash available somewhere. At another point, he laid out his "retirement plan," which was to generate $10 million in four years, turn over the business to others, and then collect royalty payments from his successors. As discussed above, agents have seized only a small portion of this money.

During the May 28, 2014 execution of search warrants on locations Defendant controlled, agents seized literally tons of evidence – thousands of kilograms of binding agent; over a million processed Xanax tablets; gallons of GHB; hundreds of pounds of steroids; pounds of oxycodone products; and

numerous pieces of industrial equipment.

### C.     The History and Characteristics of Defendant Demonstrates a Risk of Flight and a Danger to the Community

There are several factors regarding Defendant's history and characteristics that indicate that is presents a risk of flight and a danger to the community that cannot be mitigated by any conditions that the Court might impose.

#### 1)     Defendant Was on Probation at the Time of this Offense

The reality is that any conditions the Court would impose will only be as effective as Defendant's compliance with them.  As discussed above, Defendant already has a prior felony drug conviction, and he was on probation for other drug offenses at the time of the conduct at issue in this indictment.  Despite the fact that Defendant was a convicted felon, and despite the purportedly restrictive conditions imposed by his status on probation, Defendant nevertheless successfully engineered, developed, and led a massive and sophisticated drug operation.  He generated in excess of a million Xanax tablets per week, plus substantial quantities of steroids, GHB, and suspected oxycodone, and he did so while on probation.  Further, as a convicted felon, he obtained and possessed an assault-style carbine rifle with an obliterated serial number.  This behavior tells the Court everything it needs to know about Defendant's willingness to abide by any conditions it may impose on his behavior. Defendant not only continued to engage in drug trafficking while he was on probation, he radically expanded the scope of his operation.  There is nothing to suggest that anything would be different should Defendant be released in this case.

#### 2)     Defendant Has Access to Substantial Illicit Funds

As discussed above, Defendant orchestrated a long-running, massive pill manufacturing operation that generated over one million tablets in a single week.  Even at an exceptionally conservative estimate of $0.50 per tablet (to account for volume discounts, losses due to seizures, etc.), that represents $500,000 per week in cash flowing to Defendant through his operation.  (This does not account for the money he made selling the gallons of GHB and the hundreds of pounds of steroids that agents seized.)  Agents have recovered only a small fraction of that money.  Defendant boasted to others that he had over $1 million in cash already, and he sketched out a retirement plan in which he would

1  amass a war chest of $10 million and then retire.

2  Because of the massive scope of his operation, Defendant likely has access to significant

3  financial resources. Although agents seized over $200,000 in cash and $25,000 in Bitcoins from

4  Defendant's operation, this likely represents a drop in the bucket with respect to his resources. As just

5  one example, at the time of Defendant's arrest and the execution of the search warrants, agents also

6  obtained search warrants for some of Defendant's safe deposit boxes. At the time of Defendant's arrest,

7  his wife arrived at the home, and she was aware what was going on. Shortly after the arrest, his wife

8  was released by agents, and she rushed to one of the safe deposit boxes. When agents executed the

9  warrant on that box two days later, it was empty, and they learned that Defendant's wife had signed in to

10 view it on the day of the arrest. While agents cannot know with any certainty what that safe deposit box

11 contained, a reasonable inference from Defendant's wife's behavior is that it contained something of

12 value that Defendant did not want law enforcement agents to seize.

13 Defendant had customers whom he supplied in 48 states. In many cases, Defendant shipped the

14 product and was paid later, either through the conversion of Bitcoins into cash or through direct cash

15 payments. Based on the sheet scale of Defendant's operation, a reasonable inference is that Defendant

16 has people who owe him money throughout the country. Further, the frequent mode of payment for

17 Defendant's drugs, particularly those he sold online, was Bitcoins. This digital currency is accessible

18 anywhere in the world. While agents made a limited seizure of only $25,000 in Bitcoins from

19 Defendant, it is possible that he has access to significantly greater quantities of this currency. Should he

20 flee, he can recover these assets wherever he chooses. When coupled with the more than $1 million in

21 cash Defendant already has, whatever Bitcoins he has that have not been seized can help sustain him as

22 a fugitive.

23                    3)    Defendant Is Comfortable Living Under an Assumed Identity

24 One of the locations agents searched on May 28, 2014, was a storage unit into which Defendant

25 went numerous times. This was the unit in which agents seized the AR-15 style rifle and the multiple

26 loaded ammunition magazines. *See* Barry Decl. Ex. A. Defendant rented that storage unit under an

27 assumed name, the alias "Josh Trout." Defendant also rented another storage unit as "Josh Trout." Not

28 only did he use this name; he provided a fraudulent "Josh Trout" California Driver License with his

picture as part of his rental application. *See* Ex. B (rental application with photograph). Defendant also received packages of raw materials for his pill manufacturing operation under the Trout alias. Further, several of the individuals who worked for Defendant did not even know his real name, referring to him only as "Xanax King" or as Josh.

4)    Defendant Has Significant Overseas Contacts

Defendant has significant contacts overseas. He has numerous contacts in China and Hong Kong from whom he has obtained alprazolam powder and the industrial equipment to create his pill factory and to whom he has sent tens and tens of thousands of dollars. He has also travelled to Amsterdam to meet with co-defendant Koskiniemi, and it is worth noting that Koskiniemi himself was arrested in this case in the airport as he was about to board a plane destined for Spain. Further, with respect to family ties to the Bay Area, while Defendant's father is a local resident, agents understand that Defendant's wife is Columbian. Thus, a life outside the country, either with his wife's family and associates in Central America or elsewhere, would be a viable proposition for Defendant, particularly when considering his access to fraudulent identification documents, his access to significant illicit funds, and the dire penalties he is facing for his current offense.

5)    Defendant Discussed the Prospect of Flight With Others in His Organization

Defendant told an associate in the drug operation that although he had fraudulent IDs, they were not good enough for him because they were not "in the system" – that is, although they had his photograph on them, they did not correspond to a real DMV record. Defendant expressed his eagerness to obtain a "real" driver license from any state so that he could obtain a genuine U.S. passport under a different name. Agents do not know whether Defendant was successful in this endeavor.

Defendant discussed with this associate a friend who had gotten in trouble with law enforcement and was able to disappear. Defendant believed that he made his way to Mexico and was never heard from again. This sounded appealing to Defendant, who described it as "being on the beach."

Defendant also had multiple discussions about transferring his money into overseas accounts. He wanted to do this so that he could have access to this money if anything happened to him, in term of being arrested or shut down. Again, agents do not know whether he was successful in this effort, and if so, to what extent.

1    Defendant told the associate that if he were ever arrested for the conduct in this case, he realized

2    that he would be facing a considerable amount of time.  Defendant and the associate then discussed the

3    fact that there would be little or no deterrent to run because of that exposure.  In essence, if Defendant

4    was facing significant prison time, ran, and was caught, he likely would not receive that much additional

5    time because the penalties for the drug offenses would be so severe.  Thus, it would be worth the risk to

6    flee.

7         **D.    The Threat Poses to the Public Should Defendant Be Released is Manifold**

8         The threat posed by Defendant should he be released takes several forms.  First, Defendant has

9    demonstrated that no conditions the Court may impose will prevent him from continuing to deal drugs.

10   That represents a clear danger to the public, as both the Senate and many courts have noted.  *Ruben*, 974

11   F.2d at 586; *Fulgham*, 2012 WL 2792439, at *4.  Lest Defendant attempt to downplay the nature of the

12   substances at issue in this case by remarking that they are not as dangerous as other drugs (such as

13   cocaine, heroin, and methamphetamine), alprazolam, GHB, and oxycodone present serious risks to the

14   public.

15        Alprazolam has played a role in roughly 10% of all cases in which people sought emergency

16   medical care, and the number of alprazolam related incidents has almost doubled since 2005.  While

17   overdose of alprazolam itself can be deadly, in the vast majority of emergency cases, users mixed

18   alprazolam with other drugs or alcohol.  When combined with central nervous system depressants, such

19   as prescription pain killers, alprazolam results in depressed breathing and heart rate, which can lead to

20   loss of consciousness and death.

21        GHB is also a dangerous drug.  Popular in the club scene, GHB is a colorless, odorless liquid.  It

22   produces euphoria and significantly reduced inhibitions.  When taken in larger doses or when combined

23   with alcohol, it also can produce amnesia.  Because of these qualities – decreased inhibitions and

24   amnesia – GHB has frequently been used to facilitate sexual assaults, leading to its inclusion among the

25   "date rape drugs."

26        Oxycodone is a strong prescription narcotic painkiller, and it has recently become among the

27   most abused drugs, and fatal overdoses related to it and opiates like it have increased dramatically in the

28   last several years.  For instance, fatal overdoses caused by opioid painkillers such as oxycodone is

UNITED STATES' MOTION FOR DETENTION
CR 14-0285 JST, <u>United States v. Jeremy Donagal</u>                                                    10

1 greater than the number of fatal overdoses resulting from heroin and cocaine combined. Thus,

2 Defendant's continued trafficking in these drugs presents a grave risk to the public.

3       Further, Defendant has demonstrated a risk to the public by possessing a firearm despite the fact

4 that he is a convicted felon. Moreover, he did not just possess any weapon – he possessed an assault-

5 style rifle with an obliterated serial number and numerous loaded magazines. *See* Barry Decl., Ex. A.

6 The Court has a substantial interest in protecting the public from the danger posed by convicted felons

7 who possess firearms and ammunition. *See, e.g.*, *Vartelas v. Holder*, 132 S.Ct. 1479, 1489 (2012)

8 ("Longstanding prohibitions on the possession of firearms by felons, however, target a present danger,

9 i.e., the danger posed by felons who bear arms.") (citing, *inter alia*, the Omnibus Crime Control and

10 Safe Streets Act of 1968, § 1201, 82 Stat. 236).

11                                    **CONCLUSION**

12       For the foregoing reasons, the government respectfully requests that Defendant be detained

13 pending trial, on the basis that he presents a risk of flight and a danger to the community and that there

14 exists no condition or combination of conditions that would mitigate this risk or danger.

15

16 Dated: June 25, 2014                         Respectfully submitted,

17

18                                MELINDA HAAG
                               United States Attorney

19

20                                \_\_\_\_\_/s/_____
                               KEVIN J. BARRY

21                                Assistant United States Attorney

22

23

24

25

26

27

28

# EXHIBIT A



# EXHIBIT B

# California Self-Storage Rental Agreement

Central Self Storage Concord, "Landlord," hereby rents to:
**Name:** Josh Trout
**Address:** 1860 Tice Creek Dr
**City:** Walnut Creek **State:** CA
**Zip:** 94595
**Res. Ph:** 925-222-2622 **Bus. Ph:**
**Cell #:**
**Email Address:**
**Driver's Lic. #:** T7029481
**License Plate/State:**

| | |
|---|---|
| Transaction Date: | October 14, 2013 |
| Unit No.: | 875 |
| Unit Monthly Rate: | $197.00 |
| Administration Fee: | $20.00 |

## NO RENT REFUNDS

| | |
|---|---|
| Return Check Charge | $25.00 |
| Late Fee (under $60/mo) | $10.00 |
| Late Fee ($60-$99/mo) | $15.00 |
| Late Fee ($100+/mo) | $20.00 |
| Certificate of Mailing - Letter | $15.00 |
| Cut Lock Fee | $15.00 |
| Inventory Fee | $15.00 |
| Advertising Fee | $50.00 |
| Pre-Lien Notice Fee | $15.00 |

_____                    October 14, 2013                    _____                    October 14, 2013
Tenant's Signature                          Date                          On Behalf of Landlord                          Date

**Do not sign this agreement until you have read it and fully understand it. This agreement releases the Landlord's liability for loss of or damage to your stored property. If you have any questions concerning its legal effect, consult your legal advisor.**

**NOTICE OF LIEN: PURSUANT TO THE CALIFORNIA SELF-SERVICE STORAGE FACILITY ACT YOUR STORED PROPERTY WILL BE SUBJECT TO CLAIM OF LIEN FOR UPAID RENT AND OTHER CHARGES AND MAY EVEN BE SOLD IF RENT AND OTHER CHARGES REMAIN UNPAID FOR FOURTEEN (14) CONSECUTIVE DAYS.**

**ALTERNATE PERSON:** Please provide the name and address of another person to whom the preliminary lien notice and subsequent notices may be sent:_____

**TERM:** The term of this agreement shall commence on the date the agreement is executed and shall continue on a month-to-month basis thereafter. The minimum term is one month.

**RENT:** The monthly rent shall be the amount stated above. The rent shall be paid to Landlord or Landlord's agent at the address designated in this agreement. Payment is due on the first day of each calendar month, in advance and without demand. Landlord reserves the right to require that the rent and other charges be paid in cash, certified check or money order. Landlord may change the rent or any other charge or fee by giving Tenant thirty (30) days advanced written notice at the address stated in this agreement. The new rent shall become effective on the first day of the next month the occupancy charge is due. If Tenant has made advanced payments, the new rent will be charged against such payments, effective upon giving notice of the new rate.

**LATE CHARGES AND OTHER FEES:** Tenant agrees to pay Landlord the indicated late fee if rent is received eleven (11) or more days after the due date. A late fee shall be charge each month the rent or any part thereof is past due. Tenant agrees to pay Landlord the return check charge stated above plus all bank charges for any dishonored check. These fees are considered additional rent and are to compensate Landlord for labor and other costs of collection. Tenant also agrees to pay the indicated collection and Auction Processing fees incurred by Landlord.

**ADMINISTRATION FEE:** Tenant shall pay the non-refundable administration fee indicated above upon executing this agreement.

**PARTIAL RENT PAYMENTS:** Landlord, in Landlord's sole discretion, may accept or reject partial rent payments. Acceptance of partial payments of rent by Landlord shall not constitute a waiver of Landlord's rights and Tenant understands and agrees that acceptance of a partial rent payment made to cure a default for non-payment of rent shall not delay or stop foreclosure on Tenant's stored property as provided by state law.

**DENIAL OF ACCESS:** When rent or other charges remain unpaid for two (2) or more days, Landlord may deny Tenant access to the storage space.

**USE OF STORAGE SPACE:** Landlord is not engaged in the business of storing goods for hire and no bailment is created under this agreement. Landlord exercises neither care, custody nor control over Tenant's stored property. Tenant agrees to use the storage space only for the storage of property wholly owned by Tenant. **Tenant agrees not to store collectibles, heirlooms, jewelry, works of art or any property having special or sentimental value to Tenant. Tenant waives any claim for emotional or sentimental attachment to the stored property.** Tenant agrees not to store property with a total value in excess of $5,000 without the written permission of the Landlord. If such written permission is not obtained, the value of Tenant's property shall be deemed not to exceed $5,000. Nothing herein shall constitute any agreement or admission by Landlord that Tenant's stored property has any value, nor shall anything alter the release of Landlord's liability set forth below.

**HAZARDOUS OR TOXIC MATERIALS PROHIBITED:** Tenant is strictly prohibited from storing or using materials in the storage space or on the facility classified as hazardous or toxic under any local, state or federal law or regulation, and from engaging in any activity which produces such materials. Landlord, at Tenant's sole expense, may enter the storage space at any time to remove and dispose of prohibited items.

**INSURANCE:** Tenant, at Tenant's expense, shall maintain a policy of fire, extended coverage endorsement, burglary, vandalism and malicious mischief insurance for the actual cash value of stored property. Insurance on Tenant's property is a material condition of this agreement and is for the benefit of both Tenant and Landlord. Failure to carry the required insurance is a breach of this agreement and Tenant assumes all risk of loss to stored property that would be covered by such insurance. Tenant expressly agrees that the insurance company providing such insurance shall not be subrogated to any claim of Tenant against Landlord, Landlord's agents or employees for loss of or damage to stored property.

Tenant shall provide evidence of the required insurance coverage in the form of a certificate of insurance or declaration page (the "Insurance Policy"). Landlord shall keep a copy of the Insurance Policy on file at all times and Tenant shall be responsible for ensuring that the Insurance Policy does not expire and remains active during the term of the rental agreement.

If Tenant does not carry the required Insurance Coverage or does not provide Landlord with an Insurance Policy, then Landlord shall enroll Tenant in the Insurance Program made available at our facility, with a minimum amount of coverage and the monthly insurance premium will be applied to tenants account.

**RELEASE OF LANDLORD'S LIABILITY FOR PROPERTY DAMAGE:** All personal property stored within or upon the storage space by Tenant shall be at Tenant's sole risk. Landlord and Landlord's agents and employees shall not be liable to Tenant or Tenants; agents for any loss of or damage to any personal property at the self storage facility arising from any cause whatsoever including, but not limited to, burglary, mysterious disappearance, fire, water damage, rodents, acts of god, the active or passive acts or omissions or negligence of the Landlord, Landlord's agents or employees.

**RELEASE OF LANDLORD'S LIABILITY FOR BODILY INJURY:** Landlord, Landlord's agents and employees shall not be liable to Tenant or tenant's agent's for injury or death as a result of Tenant's use of the storage space or the self storage facility, even if such injury is caused by the active or passive acts or omissions or negligence of the Landlord, Landlord's agents or employees.

**INDEMNITY:** Tenant agrees to indemnify, hold harmless and defend Landlord from all claims, demands, actions or causes of action (including attorneys' fees and all costs) that are hereinafter brought by others arising out of Tenant's use of the storage space and common areas.

**RULES AND REGULATIONS:** Landlord shall have the right to establish or change the hours of operation for the facility and to promulgate rules and regulations for the safety, care and cleanliness of the premises or the preservation of good order on the facility. Tenant agrees to follow all rules and regulations now in effect, or that may be put into effect from time to time.

**TENANT ACCESS:** Tenant's access to the premises may be conditioned in any manner deemed reasonably necessary by Landlord to maintain order on the premises. Such measures may include but are not limited to, limiting hours of operation, requiring verification of Tenant's identity and inspecting vehicles that enter the premises.

**LANDLORD'S RIGHT TO ENTER:** Tenant grants Landlord, Landlord's agents or representatives of any governmental authority, including police and fire officials, access to the storage space upon two (2) days advanced written notice to Tenant. In the event of an emergency or nuisance, Landlord, Landlord's agents or representatives of governmental authority shall have the right to enter the premises without notice to Tenant, and take such action as may be necessary or appropriate to preserve the premises, to comply with applicable law or to enforce Landlord's rights.

**LOCKS:** Tenant shall provide, at Tenant's own expense, a lock that Tenant deems sufficient to secure the space. If the space is found unlocked Landlord may, but is not obligated to, take whatever measures Landlord deems reasonable to re-secure the space, with or without notice to Tenant.

**TERMINATION:** Thirty (30) days written notice given by Landlord or Tenant to the other party will terminate the tenancy. Landlord does not prorate partial month's occupancy charges. Prepaid full month's occupancy charges shall be returned to Tenant within thirty (30) days of vacating the unit provided space is left vacant and broom clean. Tenant is responsible for all damage to the storage space and the cost of disposal of any property left in the storage space.

**PROPERTY LEFT ON THE PREMISES:** Landlord may dispose of any property left on the premises by Tenant after Tenant has terminated his or her tenancy. Tenant shall be responsible for paying all costs incurred by Landlord in disposing of such property.

**WAIVER OF JURY TRIAL:** Landlord and Tenant waive their respective rights to trial by jury of any cause of action, claim, counterclaim, or cross complaint, in any action brought by either Landlord against Tenant, or Tenant against Landlord, or Landlord's agents or employees, on any matter arising out of, or in any way connected with, this rental agreement, Tenant's use of the storage space or this storage facility, or any claim of bodily injury or property loss or damage, or the enforcement of any remedy under any law, statute or regulation. This jury trial waiver is also made by Tenant on behalf of any of Tenant's agents, guests or invitees.

**NOTICES:** All notices required by this rental agreement shall be delivered in person or sent by first class mail postage pre-paid to Tenant's last known address. Notices shall be deemed given when deposited in the United States mail. Tenant agrees that any such notice is conclusively presumed to have been received by Tenant five (5) days after mailing, unless returned to Landlord by the U.S. Postal Service. All statutory notices shall be sent as required by law.

**NO WARRANTIES:** No expressed or implied warranties are given by Landlord, Landlord's agents or employees as to the suitability of the storage space for Tenant's intended use. Landlord disclaims and Tenant waives any implied warranties of suitability or fitness for a particular use.

**NO ORAL AGREEMENTS:** This rental agreement contains the entire agreement between Landlord and Tenant, and no oral agreements shall be of any effect whatsoever. Tenant is not relying, and will not rely, upon any oral representation made by Landlord or by Landlord's agents or employees purporting to modify or add to this rental agreement. Tenant understands and agrees that this agreement may be modified only in writing.

**NO SUBLETTING:** Tenant shall not assign or sublet the storage space without the written permission of the Landlord.

**SUCCESSION:** All provisions of this rental agreement shall apply to and be binding upon all successors in interest, assigns or representatives of the parties hereto.

**ENFORCEMENT:** If any part of this rental agreement is held to be unenforceable for any reason, in any circumstance, the parties agree that such part shall be enforceable in other circumstances, and that all the remaining parts of this agreement will be valid and enforceable.

**SPACE SIZE APPROXIMATE:** Space sizes are approximate and for comparison purposes only. Spaces may be smaller than indicated in advertising or other size indicators. Tenant is renting storage space based solely upon physical inspection of the storage space and customer's assessment of need for space.

Tenant Initials: _____

# Bob BADER Company Insurance Agency
## Personal Property Participation Form

**Central Self Storage Concord**
5733 Pacheco Blvd.
Pacheco, CA 94553

OPERATOR #: 1209
925-691-5700

The Lessee may participate in coverage arranged by the storage facility which covers personal property against fire, smoke, explosion, and windstorm. This coverage will be provided through a licensed Agent. **NEITHER THE STORAGE COMPANY NOR THE LEASING AGENT ARE INSURANCE AGENTS. DIRECT QUESTIONS TO BOB BADER COMPANY INSURANCE AGENCY - Toll-Free Phone: 888-223-3726 or Fax: 888-329-2237**

**LESEE INFORMATION**
Lessee's Name(s): Josh Trout
Lessee's Address: 1860 Tice Creek Dr

Effective Date: October 14, 2013
Unit #: 875
Disc/Cylinder Lock: ☐ YES  ☐ NO

City, State, Zip: Walnut Creek, CA 94595
Daytime Phone #: 925-222-2622
Email Address:

**COVERAGE SELECTION** (Initial one box and complete the information)
☑ **YES, I AGREE TO PARTICIPATE IN THE TENANT INSURANCE PROGRAM FROM BOB BADER COMPANY INSURANCE AGENCY,** a licensed insurance agency, and to pay the monthly premium when due. I understand that a portion of the price I'm agreeing to pay covers the storage company's cost of collecting, accounting for, and remitting premium to the insurance company. I understand the storage facility is not responsible for paying my premiums if I fail to make payment and I understand that failure to pay my premium when due will result in cancellation of the coverage.

Coverage:           $2,000.00
Monthly Premium:    $9.00
Type of Goods Stored: ☐ Household Goods/Personal Property
                      ☐ Business/Trade Property (describe) _____
                      ☐ Vehicle, Boat/Trailer (describe) _____

The Commercial Inland Marine Leased Premises Property Coverage Program provides coverage for your personal property while it is stored in the storage facility. The program is underwritten through The Pennsylvania Manufacturers' Association Insurance Company (PMAIC) and coverage is subject to their underwriting requirements. Coverage is not "all risk" and **flood coverage is not provided.** Property stored in open lots or non-fully enclosed, secured garages or storage units is not eligible. This participation form contains only a general description of coverage and does not constitute an insurance contract. You will be provided a Certificate of Property Insurance and a Summary of Coverage. By signing below, I acknowledge that I understand the coverage I have agreed to purchase will terminate if my premium due is more than 30 days delinquent under the terms of my Summary of Coverage. I authorize re-instatement of said coverage under the same terms and conditions without completing a new participation form under the following circumstances: 1. I am still renting the same unit shown on my original participation enrollment form. 2. I understand that I will NOT be charged premium for the period during which coverage had been terminated and that there is NO COVERAGE for the period during which coverage had been terminated. 3. There is no loss or damage to any property stored in this unit. If there was damage to, or loss of, any property stored in the unit that occurred after the coverage terminated for non-payment, I understand that the coverage will not apply to this loss and I agree that I will not file a claim for said loss or damage with the insurance company or storage facility.

Signature(s): _____ Date: 10/14/13

[    ] I have content coverage of the type checked below. A copy of my policy Declarations page is attached as evidence of coverage. I agree to keep coverage in force during the term of my lease.

Insurance Company Name: _____
☐ Homeowners      ☐ Renters            ☐ Business      ☐ Owners  ☐ Other: _____
Policy #: _____  Limit $: _____  Effective Date: _____  Term: _____
Signature(s): _____  Date: _____

Agent: Maureen A. Lee - CA License 0H09038 - **FOR CALIFORNIA USE ONLY**